IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

JOYCE LONG,                          )
                                     )
              Plaintiff,             )
                                     )
       v.                            )      Case No.
                                     )      04-5063-CV-SW-REL-SSA
JO ANNE BARNHART,                    )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

## ORDER DENYING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Joyce Long seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for a period of disability and disability insurance benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that (1) the ALJ erred in failing to give controlling weight to plaintiff's treating physician, Dr. Joseph, (2) the ALJ improperly found that plaintiff's mental impairment is not severe, and (3) the ALJ erred in finding plaintiff not credible. I find that the ALJ properly analyzed plaintiff's credibility and found her subjective allegations of disabling pain to be less than credible, the ALJ properly gave little or no weight to the Medical Source Statements prepared by Dr. Joseph, and the ALJ properly found that plaintiff's mental impairment is not severe. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

# I.    BACKGROUND

On February 16, 2001, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since July 7, 1998.  Plaintiff's disability stems from heart problems, thoracic outlet syndrome[1], fibromyalgia, arthritis, hypertension, and migraines.  Plaintiff's application was denied on July 25, 2001.  On September 20, 2001, plaintiff requested an administrative hearing, and on July 17, 2003, almost two years later, a hearing was held before an Administrative Law Judge.  On March 16, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On June 15, 2004, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

# II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392

---

[1]Thoracic outlet syndrome is a combination of pain, numbness, tingling, weakness, or coldness in the upper extremity caused by pressure on the nerves and/or blood vessels in the thoracic outlet, a space between the rib cage (thorax), and the collar bone (clavicle) through which the main blood vessels and nerves pass from the neck and thorax into the arm.

2

(8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a

continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?
    Yes = not disabled.
    No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert

Terri Crawford, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from

1976 through 1998:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1976 | $        40.80 | 1988 | $  17,576.73 |
| 1977 | 2,423.32 | 1989 | 18,202.50 |
| 1978 | 7,723.95 | 1990 | 18,277.15 |
| 1979 | 8,324.45 | 1991 | 16,876.75 |
| 1980 | 8,842.60 | 1992 | 6,034.96 |
| 1981 | 12,430.34 | 1993 | 14,942.47 |
| 1982 | 6,313.36 | 1994 | 16,051.41 |
| 1983 | 11,846.95 | 1995 | 19,706.04 |

| 1984 | 3,666.88 | 1996 | 21,596.50 |
|------|----------|------|-----------|
| 1985 | 14,600.19 | 1997 | 18,762.38 |
| 1986 | 17,187.50 | 1998 | 13,571.71 |
| 1987 | 17,363.00 | | |

(Tr. at 76, 79).

## B.    SUMMARY OF MEDICAL RECORDS

Below is a summary of the relevant medical records:

On April 15, 1995, plaintiff saw Daniel Dagen, D.O, a neurologist (Tr. at 144-145). Dr. Dagen diagnosed left cubital tunnel syndrome [nerve entrapment at the elbow] by clinical history, recommended conservative treatment with observation and an elbow pad, and told plaintiff to come back for a recheck in four months.

On August 18, 1995, plaintiff returned to see Dr. Dagen for a follow up (Tr. at 142-143). His diagnostic impression was:

1.      Normal electrophysiologic evaluation of the left upper extremity.

2.      Mild cubital tunnel syndrome, by clinical history.

He recommended conservative treatment including a muscle relaxant and referral to a physical therapist for instruction in thoracic outlet exercises.

On November 8, 1995, Michael Farrar, D.O., wrote a letter to plaintiff's attorney (Tr. at 254-257). Plaintiff was 181 pounds. She stated that as far as the right knee she was actually doing fairly well. She had had minimal pain. Summary: "Beyond this point, I am doubtful her condition will improve and

6

maximum medical recovery has been achieved. I am unable to be accurate concerning any periods of temporary total disability. Therefore, to summarize, based upon injuries that occurred while in the employ of Reliable Home Health on or about August 16, 1994, in my opinion, Ms. Long has [a 15% impairment of her left arm, a 15% impairment of her right leg; and a 20% impairment of her left foot.]"

On February 16, 1996, plaintiff was examined by Larry Deffenbaugh, D.O. (Tr. at 156-157). She was 5'9" and weighed 188 pounds. Dr. Deffenbaugh diagnosed irritable bowel syndrome and prescribed Colace and Dicyclomine.

On March 14, 1996, Dr. Randy B. Weiss performed a renal ultrasound which was normal (Tr. at 154).

On May 16, 1996, plaintiff was examined by Michael Joseph, M.D. (Tr. at 198). She weighed 188 pounds. Her musculoskeletal exam revealed some tenderness of her PIP [mid-finger] joints. There was mild spurring. There were multiple myofascial tender points in her neck, back, chest, arms and legs. "I feel that this patient has primary Sjogren's syndrome[2] that is manifested as dryness of her eyes, nose, throat and vagina. The patient has fibromyalgia which is manifested as diffuse muscle aches, malaise, fatigue, insomnia and multiple myofascial tender points. She is developing mild osteoarthritis of her fingers."

_____

[2]An autoimmune disease, also known as sicca syndrome, that classically combines dry eyes, dry mouth, and another disease of connective tissue such as rheumatoid arthritis.

Dr. Joseph prescribed Daypro [a non-steroidal anti-inflammatory], Zoloft [treats mental depression and anxiety disorder], Pilocarpine [treats eye conditions], and Flexeril [muscle relaxer], and recommended plaintiff return in a month.

The following day plaintiff had lab work done which revealed that her cholesterol was 226 (normal is below 200) (Tr. at 200).

Nearly a year later, on March 3, 1997, plaintiff saw Eugene Langevin, D.O. (Tr. at 189). Plaintiff's weight was 182. She had a treadmill stress test with 7.38 minutes total exercise. Summary:

1.      Abnormal resting echocardiogram consistent with ischemic[3] heart disease in the distribution of the right, and or circumflex arteries.

2.      Decreased functional aerobic capacity.

3.      Hypertensive response to exercise.

His recommendation was: Consider cardiac catheterization to define coronary anatomy as a guide to further therapy.

On April 21, 1997, Dr. Langevin performed a left heart catheterization, coronary angiography, and renal angiography (Tr. at 186-187). His assessment was:

1.      Elevated left ventricular end-diastolic pressure secondary to hypertensive cardiovascular disease.

2.      Normal coronaries.

_____

[3]Reduction in blood flow.

8

3.     Normal renal angiogram.

On June 29, 1997, plaintiff was seen at St. John's Regional Medical Center by Jeffrey F. Schaffer, M.D., who took a chest x-ray (Tr. at 172).  He found no active pulmonary disease.

On July 1, 1997, plaintiff had an echocardiogram done at St. John's (Tr. at 168, 173, 184-185).   The findings were:

1.     Normal chamber sizes, normal indices, left ventricular systolic and diastolic function,

2.     Questionable focal posterior wall hypokinesis, actually improved since previous echocardiogram,

3.     No evidence of significant valvular regurgitation.

On July 2, 1997, plaintiff saw Dr. Langevin (Tr. at 174-175).  Her blood sugar level was 115, EI series showed no abnormality, Barium swallow was normal, chest x-ray showed no active pulmonary disease.  His final diagnosis was:

1.     Hypertension,

2.     Non-cardiac chest pain,

3.     History of myocardial infarction.

He continued her medical management including aspirin, nitroglycerin drip, Prilosec, Lotensin, and IMDUR.  Plaintiff was dismissed to go home after her chest pain resolved.

On July 7, 1997, plaintiff returned to St. John's Regional Medical Center (Tr. at 161-167). Her pre-op diagnosis was chest pain. The doctor performed an esophagogastroduodenoscopy[4]. The post-op diagnosis was duodenitis [inflammation and irritation of the wall of the first part of the small intestine].

On July 25, 1997, plaintiff returned to see Dr. Langevin (Tr. at 183). Plaintiff's weight was 182 pounds, she was listed as a non-smoker with an inactive lifestyle. She had a treadmill stress test and walked for 9.34 minutes total. Summary:

1. High functional aerobic capacity,

2. No definite objective or subjective evidence of an ischemic response to exercise,

3. Improvement in previously noted segmental wall abnormality, suggesting spontaneous improvement or improvement with nitrates.

His recommendations were to continue the nitrates and continue follow up with yearly exercise tolerance tests.

---

[4] Esophagogastroduodenoscopy ("EGD") is a procedure during which a small flexible endoscope is introduced through the mouth (or with smaller caliber endoscopes, through the nose) and advanced through the pharynx, esophagus, stomach, and duodenum. An enteroscope, a longer endoscope, can be introduced beyond the ligament of Treitz into the jejunum. EGD is used for both diagnostic and therapeutic procedures. Most modern endoscopes now use a video chip (charged coupled device) for better imaging, as opposed to the older endoscopes, in which fiber optics are used for image transmission.

On March 10, 1998, plaintiff called Dr. Langevin with questions about her medication because she wanted to have a baby (Tr. at 182). Dr. Chesney told her two of her medications would need to be changed.

Less than four months later, July 7, 1998, was plaintiff's alleged onset date.

On March 4, 1999 – a year after her last medical appointment – plaintiff returned to see Dr. Langevin for another treadmill stress test (Tr. at 188). She walked for 9.0 minutes total. Summary:

1.      Good functional aerobic capacity.

2.      Normal chamber sizes and normal ejection fraction.

3.      Mild resting apical hypokinesis[5], improving after exertion, suggesting adequate coronary reserve without objective or subjective evidence of an ischemic response[6] to exercise.

4.      Blunted chronotropic[7] response to exercise, consistent with beta blockade.

On March 12, 1999, plaintiff returned to see Dr. Joseph after a nearly three-year absence from his care (Tr. at 195-196). He had previously seen

_____

[5]Hypokinesis refers to decreased contractile function of the left ventricle. After a heart attack, the heart muscle in the distribution of the vessel involved in the heart attack is often hypokinetic due to the damage caused by the heart attack. However, the contractile function of the heart can sometimes be restored after the initial treatment of a heart attack by treating the blockage(s) with angioplasty or bypass surgery.

[6]Ischemia refers to reduction in blood flow.

[7]Affecting the rate of rhythmic movements such as the heartbeat.

11

plaintiff for osteoarthritis, fibromyalgia, and a sicca syndrome[8]. "The patient has not been seen since 5/16/96." Dr. Joseph performed a physical exam and found tenderness and swelling of the DIP [fingertip] and PIP [mid-finger] joints. There was minimal tenderness of the MCP joints [the joint at the first knuckle of the hand]. "I feel that this patient has fibromyalgia manifested as muscle aches, malaise, fatigue and insomnia. She may have some underlying depression associated with her symptoms. She seems like she has developed an inflammatory arthritis of her hands, most likely OA [osteoarthritis] due to her distribution." He took x-rays, recommended further tests, prescribed Celebrex[9], Paxil[10], and Ultram[11], and recommended plaintiff return in six months.

Plaintiff did not return to the doctor for another two years. In the meantime, on February 16, 2001, she filed her application for disability benefits.

On May 22, 2001, plaintiff saw Saad M. Al-Shathir, M.D. (Tr. at 201-202). Her chief complaint was fibromyalgia. "She is hurting all over since she was a teenager. Patient claims that she requires rest between work, which cannot be provided on a regular basis for her. She gets fatigued easily. Some insomnia.

_____

[8]An autoimmune disease, also known as Sjogren syndrome, that classically combines dry eyes, dry mouth, and another disease of connective tissue such as rheumatoid arthritis.

[9]Celebrex is used to relieve some symptoms caused by arthritis, such as inflammation, swelling, stiffness, and joint pain.

[10]Paxil is used to treat mental depression and anxiety.

[11]Ultram is used to treat pain.

12

Activities increase pain level." Plaintiff reported she was married, has an LPN degree, "has not worked since August '98." Plaintiff weight 201 pounds. Dr. Al-Shathir performed a spine inspection. "During range of motion she was able to flex 60°[12], but able to reach the floor while she is sitting on a chair putting on her socks and shoes." Palpation revealed diffuse tenderness all over her body and not limited to the 18-points of the fibromyalgia.

Dr. Al-Shathir's diagnosis was:

1.      Fibromyalgia.

2.      Coronary vessel disease under care of cardiologist.

3.      Migraine.

4.      Presumably vascular thoracic outlet syndrome[13]. Could not be detected by clinical examination.

On July 6, 2001, Dr. Daniel Dagen was asked to send records and answer questions regarding plaintiff's alleged impairments (Tr. at 141). Dr. Dagen wrote, "I have no recent records" and returned the form with no further information. His last appointment with plaintiff had been August 18, 1995, when plaintiff saw him for elbow problems.

_____

[12]Flexion is bending forward, and 90° is normal.

[13]Thoracic outlet syndrome is a combination of pain, numbness, tingling, weakness, or coldness in the upper extremity caused by pressure on the nerves and/or blood vessels in the thoracic outlet, a space between the rib cage (thorax), and the collar bone (clavicle) through which the main blood vessels and nerves pass from the neck and thorax into the arm.

13

Plaintiff's application for disability benefits was denied on July 25, 2001. She requested a hearing before an administrative law judge on September 20, 2001.

On November 5, 2001, plaintiff returned to see Dr. Langevin for a treadmill stress test (Tr. at 207). She exercised for 10 minutes 24 seconds total. Summary:

1. Abnormal resting echocardiogram consistent with mild inferior posterior wall hypokinesis seen on previous examinations.

2. No objective or subjective evidence of an ischemic response to exercise.

Dr. Langevin recommended plaintiff continue her medical therapy.

On August 22, 2002, plaintiff returned to see Dr. Joseph (Tr. at 208). "The patient describes short-term memory loss, increase in equilibrium problems falling three to four times since her last visit, swelling of the feet and legs, neuropathy [loss of sensation] type pain, swelling of the hands and joints, visual disturbances such as blurry vision, insomnia, joint pain, some better with cycles, ear and nose bleeding intermittently, GI [gastrointestinal] acid reflux, gas and bloating. On physical exam no joint tenderness or synovitis[14]. . . . I feel that this patient is fairly stable. I told her she needs a primary care physician to address

[14]Inflammation of the synovial membrane that lines a synovial joint [a free-moving joint]; results in pain and swelling.

14

all of her medical problems.  I do not think she has anything rheumatologic.  She did have a slightly elevated blood sugar."

On September 25, 2002, David Coleman, O.D., sent a letter to plaintiff's counsel (Tr. at 210).  "Joyce was last seen in my office on April 5, 2002. . . . Initial visit visual acuity was right eye 20/20 and left eye 20/30.  Best correct visual acuity with proposed prescription was right eye 20/20 and left eye 20/20.  Treatment was:  1. Spectacle prescription.  2. Liposome spray for dry eye.  I can see no visual reason for a claim of disability at this time."

On October 1, 2002, plaintiff saw Terry Nye, M.D. (Tr. at 220-222, 224).  Plaintiff was a new patient with complaints of vertigo and high blood sugar.  Dr. Nye took two chest x-rays of plaintiff's heart and lungs, which were normal, "no sign of acute pulmonary disease".  He diagnosed vertigo, hyperglycemia, hypertension (controlled), degenerative joint disease, fibromyalgia (uncontrolled), depression with anxiety (uncontrolled), anemia, and hypothyroidism [inadequate levels of thyroid hormone in the tissues].  He recommended that plaintiff work on her diet and lose weight, and he ordered blood work.

On October 1, 2002, Dr. Joseph completed a Medical Source Statement - Physical (Tr. at 211-212).  Dr. Joseph found that plaintiff could lift or carry less than five pounds frequently and less than five pounds occasionally; stand or walk continuously for less than one hour; stand or walk for less than one hour total during an eight-hour work day; sit continuously for 30 minutes and for less than

15

an hour total during an eight-hour work day; can never climb, balance, stoop, kneel, crouch, crawl, or reach; may occasionally handle and speak; may frequently finger, feel, see, and hear; should avoid any exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights. The form asks Dr. Joseph whether plaintiff needs to lie down or recline to alleviate pain. He checked, "yes". The form then says, "If so, How often". Dr. Joseph's response is illegible – it appears to say 92° which makes no sense to me. In any event, he wrote that plaintiff would need to lie down or recline for a duration of 30 minutes. Finally, he responded affirmatively when asked whether any of plaintiff's medications result in fatigue or a decrease in concentration.

On October 1, 2002, Dr. Joseph completed a Medical Source Statement - Mental (Tr. at 215-216). Dr. Joseph found that plaintiff is markedly limited in the following:

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

16

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

He found that plaintiff is "extremely limited" in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

(Tr. at 215-216).

On October 25, 2002, plaintiff saw Jennifer Stratton, RN , at Neurological Associates of Joplin (Tr. at 228-230, 261-263). Plaintiff had been referred by Dr. Nye for a neurologic evaluation. Plaintiff complained of dragging her left lower extremity while walking for the past three or four years. "Gait examination reveals a normal base and normal stride. Heel, toe, and tandem walking are intact." Ms. Stratton diagnosed gait ataxia[15] and dizziness. Ms. Stratton recommended additional workup including an MRI of the brain. "I anticipate that these symptoms are most likely related to her fibromyalgia."

On October 29, 2002, Dr. Nye had an MRI of the brain done on plaintiff which was normal (Tr. at 226).

Plaintiff saw Nurse Stratton again on November 5, 2002 (Tr. at 227, 264). Plaintiff complained of dragging her left lower extremity, noted some falls since her last appointment on October 25, 2002, and had complaints of numbness in her fingertips. "Her physical examination is without change." Ms. Stratton recommended plaintiff return for an electromyography/nerve conduction velocity study of the left upper and lower extremities to further evaluate her complaints, and she set up testing with Dr. Andrew of her office on November 11, 2002.

---

[15]Ataxia is an inability to coordinate muscle activity during voluntary movement, most often due to disorders of the cerebellum or the posterior columns of the spinal cord. May involve the limbs, head, or trunk.

On November 11, 2002, plaintiff saw Christopher Andrew, M.D., who then wrote a letter to Dr. Nye (Tr. at 231, 265). Dr. Andrew performed an electrophysiologic evaluation of the left upper and lower extremity. The study was normal and showed no evidence of neuropathy or radiculopathy. "I see no evidence of any active neurologic process in this patient to account for her symptoms. Certainly, they may be related to her fibromyalgia. I see no evidence also of any active diabetic type of neuropathy."

On November 20, 2002, plaintiff returned to see Dr. Nye (Tr. at 219, 222). He noted that plaintiff had been seen on October 1, 2002, as a new patient, her glucose was 183 (normal is 65-105), her cholesterol was 236 (normal is 127-200), and her triglycerides were 432 (normal is 35-135). "Never filled Tricor RX [used to lower cholesterol and triglycerides]". Plaintiff's MRI of the brain was normal. "Reviewed results with patient - still has many pain complaints." Dr. Nye diagnosed hyperglycemia [high blood sugar]; hyperlipidemia [high cholesterol and triglycerides], uncontrolled; depression with anxiety, uncontrolled." He recommended plaintiff check fasting blood sugar when possible, start Tricor, and come back for lab work. "[A]dvised Dx [diagnosis] of anxiety - pt [patient] disagrees with Dx and refuses Rx [prescription]."

On January 2, 2003, plaintiff saw Dr. Langevin for a cardiovascular evaluation (Tr. at 241-242). She stated that she still had chest discomfort associated with shortness of breath with exertion, relieved with rest. Her weight

19

was 204 pounds. "Her last cholesterol she reports to me is over 400." Dr.

Langevin assessed:

1.      New onset diabetes mellitus.

2.      Recurrent angina.

3.      Fibromyalgia.

4.      Degenerative joint disease and possible early rheumatoid arthritis.

5.      Hyperlipidemia.

Plan: "The patient is overweight. I have suggested that she go on a

Pritican[16] [sic] diet or [at] least a protein pow[d]er diet. . . . At present, her

electrocardiogram is normal. I have no new recommendations to make for her at

this time."

On April 18, 2003, plaintiff had lab work done at Dr. Langevin's office (Tr.

at 271). Her triglycerides were 199 (normal is 35-135), her cholesterol was 231

(normal is 127-200), her LDL cholesterol was 140 (normal is less than 130), and

her glucose was 146 (normal is 65-105). Someone wrote "diet consult" very large

and circled it.

That same day, plaintiff saw Troy D'Amour, D.O. (Tr. at 234-239).

Plaintiff wrote on the forms that she exercises occasionally. Her weight was 212

pounds. Dr. D'Amour performed an exam and all findings were normal. He

_____

[16]The Pritikin diet is based on foods that contain 400 calories or less per
pound, are made up almost exclusively of whole grains and vegetables, and are
extremely low in fat.

20

diagnosed diabetes, hypertension, and osteoarthritis. His recommendation was to continue on her current regimen.

On May 5, 2003, plaintiff saw Dr. Joseph for a follow up on her fibromyalgia, osteoarthritis, and sicca syndrome (Tr. at 244, 252). "She has diabetes which is being controlled with diet and weight loss." Plaintiff complained of numbness, tingling, and burning in her feet. She reported that she had had stumbling and trouble walking. She continued to have muscle aches, malaise and fatigue. "On physical exam 18 out of 18 trigger points for fibromyalgia." Dr. Joseph gave plaintiff Neurontin[17], prescribed Lexapro[18] in place of her Celexa, and told her to come back for re-evaluation in six months.

On May 9, 2003, Dr. Joseph completed a Medical Source Statement - Mental (Tr. at 246-247). He found that plaintiff is extremely limited in every single category:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out very short and simple instructions

- The ability to carry out detailed instructions

---

[17]Used to control seizures in the treatment of epilepsy.

[18]Lexapro is used to treat mental depression.

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

22

- The ability to set realistic goals or make plans independently of others

(Tr. at 246-247).

That same day Dr. Joseph completed a Medical Source Statement - Physical making the following findings: plaintiff could lift or carry less than five pounds frequently and less than five pounds occasionally; stand or walk continuously for less than an hour and for less than an hour total during an eight-hour workday; sit for 15 minutes continuously and for less than an hour total during an eight-hour workday; is limited in her ability to push and pull as it will exacerbate her fibromyalgia and her osteoarthritis; may never climb, balance, stoop, kneel, crouch, or crawl; may occasionally reach or handle; may frequently finger, feel, see, speak and hear; and must avoid any exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, or heights (Tr. at 249-250). He noted that plaintiff does need to lie down or recline during the day for 20 minutes at a time for pain relief, and again his answer to how often is illegible (Tr. at 250). He wrote that plaintiff's medication, pain, or side effects will cause a decrease in concentration, persistence, or pace (Tr. at 250).

On June 30, 2003, plaintiff had lab work done in the office of John Freitas, D.O. (Tr. at 227). Her triglycerides were 268, cholesterol was 237, LDL cholesterol was 133, VLDL cholesterol was 53.6 (normal is 5-41), and her glucose was 161.

23

The following day, on July 1, 2003, plaintiff had an appointment with Dr. Freitas; however, none of his medical notes are legible (Tr. at 274).

On July 15, 2003, plaintiff saw Dr. Coleman (Tr. at 269). He wrote that he had last evaluated plaintiff on May 23, 2003. She had been diagnosed with Chronic Keratitis sicca [persistent dryness of the cornea] from Sjogren's Syndrome and astigmatism. She was given an ocular lubricant and prescription for glasses.

On August 15, 2003, Jan Snider Kent, Ph.D., performed a psychological evaluation of plaintiff at the request of Disability Determinations (Tr. at 282-287). Dr. Kent reviewed plaintiff's medical records, performed a mental status evaluation, performed six item cognitive impairment test, and performed a psychodiagnostic interview. Dr. Kent's report reads in part as follows:

Education History:

Ms. Long attended school through the 12th grade. She made A and B grades throughout her schooling. She attended college for two years, obtaining and Associates of Arts degree in Nursing. She states that although she completed her academic work to complete her RN, the day she was supposed to take her Board Exams, her husband beat her up and she never took the test. . . .

Employment History:

Ms. Long has not worked since 1999. At that time she had worked for a year and a half as an LPN at Ladue Home Health. She states that she had to quit that job because she would become exhausted. She states, "I'm kind of an extremist. I go back and try to do too much." Prior to this she worked at Oxford as a[n] LPN for five years. She states that this was when she first began getting sick. She states she was terminated from this job

24

because she couldn't keep up.  She states, "I couldn't find the balance between patient care and paperwork.  I would see patients, but I didn't get my paperwork done." . . .

<u>Marital History and Living Arrangements</u>:

Ms. Long has been married twice.  She was married for two and a half years to her first husband and this marriage ended due to his abuse.  She has been married to her second husband for eleven years.  She has no children from this marriage.  She reports she has had two miscarriages.

. . . <u>Psychiatric History</u>:

. . . She has never received outpatient treatment for emotional difficulties, other than medication. . . .  Ms. Long was never hospitalized for psychiatric reasons. . . .

<u>Daily Activities and Social Functioning</u>:

. . . She gets up around 10 in the morning.  She feeds the dogs and waters the flowers that she has in pots. . . .  She does laundry and loads the dishwasher. . . .  Her husband does most of the grocery shopping.  She states she gets big muscle spasms and knots in her muscles if she does too much.  She states she can handle her finances without difficulty.  Ms. Long reports she used to take care of everything and now can only do one thing at a time.  She states if she does more than one thing at a time, her blood pressure increases, she gets angina, her blood-sugar level increases, and she has heart palpitations.  She reports a lot of difficulty with insomnia.  She states she used to read a lot, but has problems with her eyes now that get in the way of this. . . .

<u>Behavioral and Symptom Presentation</u>:

Ms. Long presents as a forty-six-year-old 5'9", 203 lb. Caucasian female. . . .  She is wearing glasses. . . .  She wears braces on her teeth. . . .  Her mood appears normal and her affect full in range. . . .  No problems with attention and concentration are noted and her eye contact is appropriate.  She has no obvious motor activities or significant pain behavior.  Ms. Long reports that she is applying for disability because of her medical difficulties.  She states that since her medical difficulties have intensified, it doesn't take very much to overwhelm her emotionally. . . .

25

Ms. Long reports having some difficulty with panic attacks. She states that these attacks will last approximately thirty minutes and consist of heart palpitations, sweating, shaking, shortness of breath, chest pain, lightheadedness, and hot flashes. She states she'll feel nauseated afterwards, take some nitroglycerin and lay [sic] down and it will stop. . . .

SUMMARY

Ms. Long presents as a forty-six-year-old Caucasian female whose intellectual functioning is estimated to be in the Average to Above Average range.

CAPABILITIES

1.  At the maximum, Ms. Long appears to be able to understand and remember moderately complex instructions during a normal workday. Her concentration difficulties would limit her to moderately complex tasks.

2.  At the maximum, Ms. Long can concentrate and persist on simple tasks during a normal workday.

3.  Ms. Long demonstrates the capacity, at the maximum, to interact in a moderate contact situation involving the general public during a normal workday.

4.  Ms. Long demonstrates the capacity to interact in a moderate contact situation involving work supervisors and/or co-workers.

5.  Ms. Long, at the maximum, has the ability to adapt to a moderately demanding work environment.

6.  Ms. Long appears capable of managing her funds independently. . . .

DIAGNOSIS

Axis I:      Panic Disorder Without Agoraphobia
             Generalized Anxiety Disorder
             Bulimia Nervosa, History of, In Partial Remission . . .

Axis V:     Global Assessment of Functioning:  55[19]

(Tr. at 282-287).

That same day, Dr. Kent completed a Medical Source Statement - Mental

(Tr. at 289-291).   Dr. Kent made the following findings:

She found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

---

[19]Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

27

She found no evidence of any limitations in the following categories:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

(Tr. at 289-291).

On November 18, 2003, plaintiff was examined by S. Subramanian, M.D., at the request of the administrative law judge (Tr. at 293-297). Dr. Subramanian's report reads in part as follows:

PHYSICAL EXAMINATION: The patient is conscious, alert, oriented, and in no acute distress.

Case 3:04-cv-05063-REL   Document 19   Filed 04/20/05   Page 28 of 64

VITAL SIGNS:  Pulse 70, respirations, 20, and blood pressure 150/90. Height 67-1/4 inches.  Weight 197-lbs. . . .

HEAD AND ENT: . . . Acuity of vision without glasses: right 20/200, left 20/200; with glasses: right 20/30, left 20/25. . . .

CARDIOVASCULAR:  First and second heart sounds[20] heard.  No murmur[21], thrill[22], or gallop[23]. No pitting edema[24].  No congestive heart failure. . . .

NERVOUS:  . . .  Gait is normal.  Not using any assistive device for walking.

MUSCULOSKELETAL:  Range of motion of all the joints are fairly well preserved.  No definite arthritis or arthropathies of the small joints of the hands were present. . . .

IMPRESSIONS:

1.      Diabetes mellitus type II, noninsulin-dependent.
2.      Hypertension.
3.      Fibromyalgia.
4.      Irritable bowel syndrome
5.      Urinary tract infection, on Macrodantin.
6.      Degenerative joint disease.
7.      Chronic migraine headache.

---

[20]The first heart sound - S1 - is in time with the pulse in the carotid artery in the neck.  The second heart sound marks the beginning of diastole - the heart's relaxation phase - when the ventricles fill with blood.

[21]A swishing or a whistling sound usually present when there is a heart valve problem.

[22]A vibration, high in frequency and sustained. If a vibration is felt but no murmur is heard, the vibration is not called a thrill.

[23]A sign of pathology, such as left ventricular failure.

[24] Excessive build-up of fluid in the tissues, or an increase in tissue mass. Swelling can occur throughout the body (generalized swelling) or swelling can be limited to a specific part of the body.

29

8.  Possible coronary artery disease.
9.  Depression.

COMMENTS:  The patient does not seem to have any disability sitting, standing, handling objects, hearing speaking, or traveling.  She also does not seem to have disability lifting a small amount of weight, carrying objects, and walking long distances; however, because of the multiple medical problems mentioned above, she may not be able to be gainfully employed.

(Tr. at 293-297).

On November 19, 2003, Dr. Subramanian completed a Medical Source Statement - Physical (Tr. at 298-301).  He found that plaintiff can occasionally lift 20 pounds and frequently lift ten pounds (abilities which, according to Dr. Subramanian, are not affected by her impairment), and stand or walk for at least two hours  in an eight-hour work day.  He found that sitting was not affected by her impairment and she has no sitting limitation.  She has a mild limitation in pushing or pulling due to fibromyalgia.  She can never climb; and she can occasionally kneel, crouch, crawl, or stoop.  She is not limited in reaching, handling, fingering, or feeling.  She has no visual or communicative limitations. She should have only limited exposure to extreme temperatures, dust, vibration, humidity, wetness, hazards such as machinery and heights, fumes, odors, chemicals, or gasses.

## C.   SUMMARY OF TESTIMONY

During the July 17, 2003, hearing, plaintiff testified; and Terri Crawford, a vocational expert, testified at the request of the ALJ.

**1.      Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 46 years of age and is now 48 (Tr. at 317).  She was 5'9" tall and weighted about 208 pounds (Tr. at 318).  Plaintiff had been married to her husband for the past 11 years (Tr. at 318).  She completed high school and has two years of college (Tr. at 318).  Plaintiff does some driving, a couple of times a week (Tr. at 318-319).  Plaintiff was receiving $140 per month from the State under its relief program for pending disabilities, she gets $248 per month in food stamps,  and her husband is self-employed (Tr. at 319).  Plaintiff has a medicaid card (Tr. at 319).

Plaintiff cannot work because she cannot lift patients, she cannot sit or stand for long periods of time, and she needs a lot of rest periods (Tr. at 320).  Plaintiff has high blood pressure, and her blood pressure normally runs around 178/94 (Tr. at 320).  Plaintiff has type II diabetes, and she takes oral medication for that (Tr. at 322).  She has passed out from her blood sugar going very high and then very low (Tr. at 330).  She also suffers from nervousness, tremors, sweats, and nausea because of her diabetes (Tr. at 330).  This happens every day for 15 to 20 minutes, and she cannot use her hands when she has these tremors (Tr. at 330).  She suffers from Sjogren's disease which is a "sister" to lupus (Tr. at 322).  It dries up all the body fluids in the membranes (Tr. at 322).  Plaintiff has degenerative arthritis, reflux disease, and thoracic outlet syndrome which is a complication of fibromyalgia (Tr. at 322-323).  That gives her migraine headaches, dizziness, and problems with her equilibrium (Tr. at 322).  Plaintiff

31

also has neuropathy [loss of sensation] in her feet which causes her to fall (Tr. at 323, 333). Plaintiff has irritable bowel syndrome and dry eye syndrome (Tr. at 323).

Plaintiff's arthritis results in her hands swelling in the morning (Tr. at 331). She has to take an ice bath and she uses a hot paraffin wax dipper (Tr. at 331). Her hands are swollen and painful for an hour or two every morning (Tr. at 331). Plaintiff rated her pain as a seven or eight on a scale of one to ten (Tr. at 332).

Plaintiff has arthritis in her knees, and she suffers from swelling in her legs (Tr. at 332-333). She has to lie down, elevate her legs, and put heat on her knees (Tr. at 333). She has heat on her knees for half a day or more (Tr. at 333).

Plaintiff has a lot of stiffness in her neck which leads to migraine headaches (Tr. at 334). Plaintiff has a migraine headache about three times per week (Tr. at 335). She also experiences a lot of low back pain (Tr. at 334).

Plaintiff's heart problems result in shortness of breath with any exertion (Tr. at 328). She has periods of weakness and feels as if she will pass out, she sweats a lot, and she suffers from chest pain (Tr. at 328). She takes nitroglycerine for chest pain up to twice a day (Tr. at 328). If she rests a lot, she does not have to take nitroglycerine (Tr. at 328). Nitroglycerine causes plaintiff to have headaches (Tr. at 328). After she takes nitroglycerine, she has to lie down for several hours (Tr. at 329).

Plaintiff also has thoracic outlet syndrome which causes pain in her neck and shoulder area, headaches, and dizziness (Tr. at 335). The muscle pushes ion the thoracic artery that goes to the brain through the neck and it causes problems with dizziness and plaintiff's thought processes (Tr. at 336).

Plaintiff suffers from depression and anxiety (Tr. at 336). She has problems with concentration and memory – her brain does not connect like it should (Tr. at 337). Her thought processes are interrupted a lot, she forgets things all the time (Tr. at 337).

Plaintiff has not worked since 1999 (Tr. at 323). She suffers from insomnia, so she sometimes does not go to sleep until 3:00 or 4:00 in the morning (Tr. at 323-324). This makes her very tired during the day (Tr. at 337). Plaintiff uses an automatic dishwasher to do her dishes, and she does some cooking (Tr. at 324). Her husband helps her with the housework on her bad days (Tr. at 324). Her husband does the grocery shopping by himself sometimes and other times plaintiff goes with him (Tr. at 325). Plaintiff has bad knees which makes it hard for her to go up and down stairs (Tr. at 325). Plaintiff can walk about a half a block before she has to stop because of the pain (Tr. at 326-327). She can stand about 15 minutes before she becomes uncomfortable ( Tr. at 327). She can sit for 20 minutes or less before she needs to change positions due to pain (Tr. at 327). She could comfortably lift about ten pounds (Tr. at 327-328).

## 2.	Vocational expert testimony.

Vocational expert Terri Crawford testified at the request of the Administrative Law Judge.  Ms. Crawford testified that plaintiff's past relevant work is as a licensed practical nurse, a skilled position performed at the heavy exertional level (Tr. at 340).

The ALJ asked if plaintiff could do any work if the ALJ found that her limitations as testified to by plaintiff were credible (Tr. at 340-341).  The vocational expert testified that a person with those limitations could not do any work (Tr. at 341).

The first hypothetical assumed an individual with 20/20 vision, who could lift ten pounds occasionally, could stand and walk two hours and sit for six hours (Tr. at 341).  The vocational expert testified that such a person could not do plaintiff's past relevant work but could perform sedentary work (Tr. at 341).  The person could be a final assembler with 1,500 jobs in Missouri and 8,100 in the country (Tr. at 342).  The person could be a cashier II, with 2,800 jobs in Missouri and 140,000 jobs in the country (Tr. at 342).

The next hypothetical assumed a person who could lift ten pounds frequently and 20 pounds occasionally, could stand and walk six hours in an eight-hour day, could sit six hours in an eight-hour day, and who had no limitation on pushing or pulling (Tr. at 342).  The vocational expert testified that such a person could not return to plaintiff's past relevant work, but could do some light exertional level jobs (Tr. at 342).  The person could be a medical

34

assistant, with 4,000 jobs in Missouri an d225,000 jobs in the country (Tr. at 343). The person could also be a mail clerk with 5,500 jobs in Missouri, and 231,000 jobs in the country (Tr. at 343).

The ALJ asked whether a person with the limitations outlined by Dr. Joseph in his Medical Source Statement - Mental or the Medical Source Statement - Physical could do any work, and the vocational expert said, "No." (Tr. at 343).

Plaintiff's attorney asked whether a person with a sedentary RFC who could only occasionally reach, handle, finger, and feel would be able to work, and the vocational expert said, "No." (Tr. at 344). The attorney then asked whether a peson who needs to lie down for relief of pain or to rest one to two hours at random per eight-hour day would be able to work, and the vocational expert again said, "No." (Tr. at 344).

After the hearing, vocational expert Terri Crawford submitted completed interrogatories (Tr. at 128-131). In the interrogatories, the vocational expert was presented with the following hypothetical:

Assume an individual aged 41 to 47 with a high school education, two years of college, and training as a licensed practical nurse and having the following restrictions: Ability to lift or carry 20 pounds occasionally and ten pounds frequently; may stand or walk for at least two hours during an eight-hour workday; has no limitation in sitting; is limited in pushing or pulling with arms

35

or legs; may never climb; may occasionally kneel, crouch, crawl, or stoop; has no manipulative limitations such as reaching; has no visual or communicative limitations; and should avoid temperature extremes, dust, vibration, humidity or wetness, hazards such as machinery or heights, fumes, odors, chemicals, and gases (Tr. at 129, 135-138). This hypothetical is consistent with the limitations listed in the Medical Source Statement - Physical of Dr. Subramanian, M.D. (Tr. at 129).

The vocational expert responded that such a person could not perform plaintiff's past relevant work, but could be a hospital admitting clerk (D.O.T. 205.362-011), or a final assembler, sedentary unskilled (D.O.T. 713.687-018) (Tr. at 129). There are 208,000 hospital admitting clerk positions in the country and 1,600 in Missouri; and there are 80,000 final assembler jobs in the United States and 1,500 in Missouri (Tr. at 129).

The next hypothetical provided in the interrogatories was as follows:

Assume an individual 41 to 47 year of age with a high school education, two years of college, and training as a licensed practice nurse, have having the following non-exertional functional limitations: Not significantly limited in her abilities to remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; maintain socially appropriate behavior and to adhere to basic standards of neatness and

36

cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. In addition the person would exhibit no evidence of limitation in the following categories: The ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. These limitations are consistent with the findings of Jan Snider Kent, Ph.D. (Tr. at 130).

The vocational expert responded that such a person could return to plaintiff's past relevant work (Tr. at 130).

The next hypothetical combined the two hypotheticals described above (Tr. at 131). The vocational expert responded that such a person could not return to plaintiff's past relevant work but could be a hospital admitting clerk or a final assembler, sedentary unskilled (Tr. at 131).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge George Wilhoit entered his opinion on March 16, 2004 (Tr. at 15-27).  He found that plaintiff met the earnings requirements for Title II benefits on her alleged onset date, but last met them as of December 31, 2003 (Tr. at 15).  She was presumed to meet the income and resource limitation for Title XVI benefits (Tr. at 15).

Step one.  The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 16).

Step two.  The ALJ determined that plaintiff's migraines and irritable bowel syndrome do not have more than a de minimus effect on her ability to perform substantial gainful activity and are therefore not severe (Tr. at 16-17).  After reviewing the medical evidence on plaintiff's mental impairment, he found that her degree of limitation based on her mental impairment is mild (Tr. at 17-18).  He then determined that plaintiff suffers from fibromyalgia, a history of myocardial infarction, diabetes, and hypertension, all impairments that are "severe" (Tr. at 18).

Step three.  The ALJ found that none of plaintiff's impairments meet or equal a listed impairment (Tr. at 18).

Step four.  Before making his determination at step four, the ALJ analyzed the medical evidence and plaintiff's credibility.  He found that plaintiff's subjective allegations are not entirely credible (Tr. at 21-23).  He then determined that plaintiff retains the residual functional capacity ("RFC") to lift or carry 20

38

pounds occasionally and 10 pounds frequently, to walk or stand for at least two hours during an eight-hour work day, and to sit without limitation (Tr. at 23). She is mildly limited in her ability to push or pull with her upper and lower extremities (Tr. at 23). She can occasionally balance, kneel, crouch, crawl, or stoop, but she may never climb (Tr. at 23). She has no manipulative limitations (Tr. at 23). She should avoid exposure to temperature extremes, dust, vibration, humidity/wetness, hazards and fumes, odors, chemicals, and gases (Tr. at 23). Finally, he found that plaintiff has no significant limitations in her ability to perform work-related mental activities (Tr. at 23).

The ALJ then found that plaintiff has the following transferable skills: interviewing skills and medical terminology (Tr. at 24).

With her RFC, plaintiff is unable to return to her past relevant work (Tr. at 25).

Step five. Because plaintiff is able to perform a wide range of work at the sedentary exertional level on a sustained basis, the ALJ determined that plaintiff could adjust to other work, i.e., a sedentary semiskilled hospital clerk, with 208,000 jobs in the national economy and 1,600 in the State of Missouri, and sedentary, unskilled final assembler, with 80,000 jobs in the national economy and 1,500 jobs in the State of Missouri (Tr. at 25). Because plaintiff can perform other jobs in the economy, she was found not disabled at step five of the sequential analysis.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as

40

plaintiff's daily activities; the duration, frequency, and intensity of the symptoms;

precipitating and aggravating factors; dosage, effectiveness, and side effects of

medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322

(8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as

those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective

complaints of disability are as follows:

> Claimant's self-reported activities of daily living are inconsistent with such
> allegations of totally debilitating symptomatology. The claimant stated
> that her activities include shopping and going out to eat, vacuuming once a
> week, doing laundry per [sic] week and cooking an evening meal. She also
> testified she drives and spends time visiting with friends and relatives
> (Exhibit 3E, and testimony of claimant). There is no evidence the
> claimant's current activities of daily living differ significantly from those
> she was able to perform on and prior to December 31, 2003. . . .
>
> The clinical and objective findings herein are inconsistent with allegations
> of total debilitation. The record is devoid of any evidence showing a
> significant degree of muscle atrophy, paravertebral muscle spasm, sensory
> or motor loss, reflex abnormality, gait disturbance, or reduced range of
> motion of the joints, an indication that claimant continues to move about
> on a fairly regular basis. In fact, the claimant's physical examinations have
> rarely reflected any physical abnormalities.
>
> The claimant testified that she is takes [sic] 1-2 nitroglycerin tablets per
> day, for chest pain, which causes headaches. However, the medical
> evidence does not reflect the claimant has told a physician that she is
> having chest pain on a daily basis, necessitating the use of nitroglycerin.
> She did not testify in regards to taking any other medications, such as pain
> medicine or antidepressant, although she has been prescribed this type of
> medication.
>
> The Administrative Law Judge also notes the claimant has not been
> prescribed other pain modalities such as a TENS unit, a back brace, or an
> assistive device for ambulation, and she has never been referred by a
> physician to a pain management clinic notwithstanding her complaints of

41

debilitating pain. Finally, she has not required aggressive medical treatment for fibromyalgia or heart disease. Her most recent heart echocardiogram showed improvement in her condition and no evidence of ischemic heart disease. Further, she only saw Dr. Joseph, who treated her fibromyalgia, approximately once every three years.

As to the claimant's complaints of dizziness and numbness of her left side, the Administrative Law Judge notes that although numerous nerve conduction studies have been performed, they have all been negative. She also had an MRI of the brain in the fall of 2002, which showed no abnormalities.

The Administrative Law Judge has examined the claimant's work record and notes the claimant had a good work history until 1998. The claimant has alleged disability beginning in July 1998. The evidence does not show a specific precipitating event around the time of the alleged onset date. The claimant has stated that she had to stop working because she could not find a job that would allow her to rest as much as she needed to. However, four months prior to alleging she was disabled, the claimant had contacted Dr. Langevin, because she desired to become pregnant. The undersigned finds it inconsistent that the claimant would need to rest too often to work, but just a few months earlier felt capable of having and raising a child.

(Tr. at 22-23).

## 1.   *PRIOR WORK RECORD*

The ALJ found that plaintiff had a good work record until 1998 when she alleges she stopped working because she could not find a job that would allow her to rest as often as she needed to. After reviewing plaintiff's earnings record, I find that this factor does indeed support plaintiff's credibility, as she worked steady, earning, for the most part, between $10,000 and $20,000 per year during the 1980's and 1990's.

Case 3:04-cv-05063-REL   Document 19   Filed 04/20/05   Page 42 of 64

## 2. *DAILY ACTIVITIES*

The ALJ noted that plaintiff believed she was well enough to get pregnant and have and raise a child less than four months before her alleged onset date. Plaintiff does not address this factor, and I find it extremely supportive of the ALJ's credibility determination.  In this case, there was no injury or any other event which marked plaintiff's alleged onset date.  In fact, plaintiff's last doctor appointment before her alleged onset date was July 25, 1997 – a full year before her alleged onset date.  Her next doctor appointment after her alleged onset date was March 4, 1999 – eight months later – for a routine treadmill stress test. Therefore, because plaintiff allegedly became disabled in the middle of a two-year absence from medical care, and shortly after she expressed her desire to become pregnant and have a baby, the ALJ properly gave substantial consideration to that factor in his credibility assessment.

Plaintiff points out that her activities of daily living are very minor, with loading and unloading the dishwasher, doing some laundry, helping her husband with grocery shopping occasionally, and driving several times per week.  These activities of daily living are not that strenuous; however, the ALJ correctly pointed out that there is no evidence plaintiff's activities of daily living are any different than they were before her alleged onset date and hence no evidence that her daily activities are limited because of her impairments.

43

### 3. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

Plaintiff told Dr. Al-Shathir that she had been "hurting all over since she was a teenager." However, plaintiff was able to work for years performing a heavy-exertional level job after her teenaged years and therefore presumably while she was "hurting all over."

Plaintiff told Nurse Jennifer Stratton that for the past three or four years, she had been dragging her left leg while walking. However, Ms. Stratton observed that plaintiff had a normal gait with a normal base and normal stride. Heel, toe, and tandem walking were all normal. The following month, Ms. Stratton again examined plaintiff and noted that plaintiff's "physical examination is without change"; i.e., she still had a normal gait. Plaintiff told Dr. Joseph that she had trouble walking. However, Dr. Subramanian subsequently observed that plaintiff's gait was normal, and he found that plaintiff had no difficulty walking long distances.

During the administrative hearing, plaintiff rated her pain as a seven or eight on a scale of one to ten, with ten being the worst. However, plaintiff has not been prescribed strong pain medication, and she has not been referred to a pain management clinic.

The evidence in the record on this factor supports the ALJ's credibility determination.

44

### 4. PRECIPITATING AND AGGRAVATING FACTORS

Plaintiff told Dr. Al-Shathir that activities increase her pain level. She told Dr. Kent that she gets "big muscle spasms and knots in her muscles if she does too much." However, no where in the medical records is there any evidence of muscle spasms. Plaintiff never stated how much was too much, i.e., what activities caused her to have increased pain or muscle spasms. However, I note that plaintiff had regular treadmill stress tests and her level of exercise increased with each subsequent test. The doctor made no note of plaintiff suffering from increased pain or muscle spasms after those treadmill stress tests.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In November 2001, plaintiff saw Dr. Langevin for a routine treadmill stress test. He recommended that she continue her medical therapy with no changes; therefore, plaintiff's medical therapy was apparently working just fine.

In September 2002, plaintiff's vision was corrected to 20/20 in both eyes with prescription lenses. Her eye doctor, Dr. Coleman, indicated there was no visual reason for a claim of disability.

In October 2002, Dr. Nye noted that plaintiff's hypertension was controlled.

In January 2003, Dr. Langevin noted that plaintiff's electrocardiogram was normal. He stated that she was overweight and recommended that she go on

45

a diet.  Other than that, he had "no new recommendations to make for her at this time."

In April 2003, Dr. D'Amour recommended that plaintiff "continue on her current regimen", indicating that plaintiff's medication treatment was working for her.

In May 2003, Dr. Joseph noted that plaintiff's diabetes was being controlled with diet and weight loss.

In November 2003, Dr. Subramanian found that plaintiff's vision was corrected to 20/30 and 20/25 with her glasses.

This evidence conflicts with plaintiff's testimony during the administrative hearing.  She testified that she passes out from her blood sugar going very high and then very low, and that she suffers from nervousness, tremors, sweats, and nausea because of her diabetes.  Not only has plaintiff never made these allegations to any doctor, these allegations are completely inconsistent with the finding that plaintiff's diabetes was controlled with diet and weight loss.

The evidence on this factor supports the ALJ's credibility determination.

**6.     *FUNCTIONAL RESTRICTIONS***

In May 2001, Dr. Al-Shathir noted that during a range-of-motion exam, plaintiff was only able to flex 60°; however, she was able to reach the floor while she was sitting on a chair putting on her socks and shoes.  This indicates that plaintiff exaggerated her functional restrictions during examinations.

46

In August 2002, Dr. Joseph found no joint tenderness or synovitis, and made the following comment: "I feel that this patient is fairly stable. . . . I do not think she has anything rheumatologic."

In August 2003, Dr. Kent observed that plaintiff had no obvious motor activities or significant pain behavior.

In November 2003, Dr. Subramanian found that plaintiff had no difficulty sitting, standing, handling objects, hearing, speaking, traveling, lifting a small amount of weight, carrying objects, or walking long distances.

This evidence contradicts plaintiff's testimony, wherein she stated that she cannot sit or stand for long periods of time, she can only walk a half a block at a time, can only stand for about 15 minutes, and can only sit for about 20 minutes. No doctor has ever placed restrictions on plaintiff's physical activities.

This factor supports the ALJ's credibility determination.

## B.     CREDIBILITY CONCLUSION

The ALJ correctly noted that nearly all of plaintiff's examinations had normal results. After treadmill stress tests, her doctor found good functional aerobic capacity, normal chamber sizes, normal ejection fraction, and no evidence of ischemic responses [reduction in blood flow] to exercise.

Plaintiff had significant periods of time with no medical care for her impairments. She spent two years without seeking care, during which her disability allegedly began and during which she desired to get pregnant. Plaintiff

47

did not seek medical care from March 1999 through May 2001, and during that two-year period she filed her application for disability benefits.

Dr. Joseph said on August 22, 2002, that plaintiff was "fairly stable". Dr. Coleman stated on September 25, 2002, that he saw no visual reason for a claim of disability. On October 1, 2002, Dr. Nye remarked that plaintiff's heart and lungs were normal and her hypertension was controlled. He recommended that plaintiff go on a diet and lose weight. On November 11, 2002, Dr. Andrew said that he saw no evidence of any active neurologic process to account for plaintiff's symptoms. Her electrophysiologic evaluation was normal. On January 2, 2003, Dr. Langevin noted that plaintiff was overweight and he suggested she go on a diet. Her electrocardiogram was normal. On April 18, 2003, Dr. D'Amour performed an exam and all findings were normal. On May 5, 2003, Dr. Joseph noted that plaintiff's diabetes was being controlled with diet and weight loss. On November 18, 2003, Dr. Subramanian observed that plaintiff's gait was normal, her range of motion was fine, she had no arthritis or arthropathies of the small joints of the hands.

Plaintiff testified that she cannot read much because of her eyes, yet her eye doctor stated that her eyes were fine, and her vision was corrected to 20/20. Plaintiff testified that she has to lie down, elevate her legs, and put heat on her knees for long periods of time; however, not one of plaintiff's doctor visits over the years was due to painful knees. Plaintiff testified that she has shortness of breath with any exertion; however, she was able to perform the treadmill stress

48

tests on a regular basis with no shortness of breath noted. Plaintiff testified that

she takes nitroglycerine for chest pain up to twice a day, but none of plaintiff's

medical records indicate she took nitroglycerine to this extent and very few of the

records indicate that plaintiff's prescription for nitroglycerine was refilled (the

last being in July 1997).

Based on all of the above, I find that the ALJ properly analyzed plaintiff's

credibility and that the substantial evidence in the record supports his finding

that plaintiff's subjective allegations of disabling pain are not entirely credible.

## VII.  OPINION OF DR. JOSEPH

Plaintiff next argues that the ALJ failed to give controlling weight to the

Medical Source Statements of Dr. Joseph and instead relied on two brief

consultative examinations performed after the hearing.  Those would be the

opinions of Dr. Subramanian and Dr. Kent.

A treating physician's opinion is granted controlling weight when the

opinion is not inconsistent with other substantial evidence in the record and the

opinion is well supported by medically acceptable clinical and laboratory

diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis

v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give

controlling weight to the opinion of the treating physician, then the ALJ must

consider several factors to determine how much weight to give to the opinion of

the treating physician:  (1) the length of the treatment relationship, (2) frequency

of examinations, (3) nature and extent of the treatment relationship, (4)

49

supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

**Length of the Treatment Relationship**

Plaintiff first saw Dr. Joseph for her impairments on May 16, 1996. She next saw Dr. Joseph on March 12, 1999 – nearly three years later. She next saw him on August 22, 2002 – more than three years later. After those three visits, over a span of more than six years, Dr. Joseph completed the Medical Source Statements at issue, finding that plaintiff could do just about nothing. The Medical Source Statements at issue are repeated below:

October 1, 2002

Medical Source Statement - Physical

- Lift or carry less than five pounds frequently and less than five pounds occasionally

- Stand or walk continuously for less than one hour; stand or walk for less than one hour total during an eight-hour work day

- Sit continuously for 30 minutes and for less than an hour total during an eight-hour work day

- Can never climb, balance, stoop, kneel, crouch, crawl, or reach

- May occasionally handle and speak

- May frequently finger, feel, see, and hear

- Should avoid any exposure to extreme cold, extreme heat, weather, wetness, humidity, dust, fumes, vibration, hazards, and heights.

50

- The form asks Dr. Joseph whether plaintiff needs to lie down or recline to alleviate pain. He checked, "yes". The form then says, "If so, How often". Dr. Joseph's response is illegible – it appears to say 92° which makes no sense to me. In any event, he wrote that plaintiff would need to lie down or recline for a duration of 30 minutes.

- He responded affirmatively when asked whether any of plaintiff's medications result in fatigue or a decrease in concentration.

October 1, 2002

Medical Source Statement - Mental

**Marked Limitation**:

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to make simple work-related decisions

- The ability to interact appropriately with the general public

- The ability to ask simple questions or request assistance

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

Case 3:04-cv-05063-REL   Document 19   Filed 04/20/05   Page 51 of 64

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to travel in unfamiliar places or use public transportation

## Extreme Limitation

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to set realistic goals or make plans independently of others

May 9, 2003

Medical Source Statement - Mental

He found that plaintiff is "extremely limited" in every single mental category. This was just seven months after his last Medical Source

52

Statement - Mental wherein he found that plaintiff was either markedly limited or extremely limited in all categories. He simply moved the "marked" limitations into the "extreme" limitations category.

Although plaintiff had been seeing Dr. Joseph for more than six years when he prepared these Medical Source Statements ("MSS"), this factor is almost irrelevant because of the three-year-long absences between visits and the fact that plaintiff only saw Dr. Joseph three times during that six-year period prior to his completing these MSS's.

**Frequency of Examinations**

This factor has already been discussed. Plaintiff saw Dr. Joseph once every three years just before he completed the October 1, 2002, MSS's. Plaintiff did not see Dr. Joseph again until May 5, 2003 – four days before he completed the second and even more limiting Medical Source Statement - Mental. This factor clearly supports the ALJ's decision to give little if any weight to Dr. Joseph's MSS's.

**Nature and Extent of the Treatment Relationship**

During her first visit with Dr. Joseph of May 16, 1996, plaintiff was diagnosed with fibromyalgia and Sjogren's syndrome (which deals with drying of the mouth, nose, eyes, and other parts of the body and was not found to be a severe impairment). He prescribed Zoloft, used to treat depression, even though there were no symptoms of depression alleged, and depression was not diagnosed.

53

Plaintiff's second visit with Dr. Joseph, on March 12, 1999, was for her osteoarthritis, fibromyalgia, and Sjogren's syndrome. He noted that she "may have some underlying depression associated with her symptoms."

During plaintiff's third visit with Dr. Joseph, on August 22, 2002, plaintiff alleged a myriad of problems – short-term memory loss, increase in equilibrium problems falling three to four times since her last visit, swelling of the feet and legs, neuropathy type pain, swelling of the hands and joints, visual disturbances such as blurry vision, insomnia, joint pain, ear and nose bleeding intermittently, gastrointestinal acid reflux, gas and bloating. Despite all of those complaints, Dr. Joseph performed an exam and found no joint tenderness or inflammation of the joints. He wrote, "I feel that this patient is fairly stable." He made no diagnosis in the medical record.

Less than six weeks later, Dr. Joseph completed the first set of MSS's. As noted above, Dr. Joseph noted that plaintiff "may have" some "underlying depression" associated with her physical symptoms. That was the only observation with regard to plaintiff's mental health during the entire treatment relationship. Yet, Dr. Joseph "found" that plaintiff was markedly or extremely limited in every single mental function. Despite having just found that plaintiff was "fairly stable" with no joint tenderness or swelling, Dr. Joseph "found" that plaintiff needed to lie down or recline during the day due to her pain. Dr. Joseph, in 1996, prescribed a non-steroidal anti-inflammatory and a muscle relaxer, but no pain medication. In March 1999, he prescribed Ultram, a pain reliever, on an

"as needed" basis and told plaintiff to return in six months; therefore, it does not appear that he planned for this prescription to be either routine or long-term. In fact, plaintiff did not return to see Dr. Joseph for more than three years. On August 22, 2002 – just a few weeks before he found in the MSS that plaintiff's pain requires her to lie down or recline several times per day – he prescribed no medication at all.

Plaintiff was not being treated for the extreme limitations Dr. Joseph noted in the MSS's. He never diagnosed her with any form of mental impairment, he merely noted that she may have some underlying depression. He prescribed pain medication on only one visit, and that was more than three years before he found that her pain prevents her from working during the day. The nature and extent of the treatment relationship in this case supports the ALJ's decision to give little or no weight to the MSS's prepared by Dr. Joseph.

**Supportability by Medical Signs and Laboratory Findings**

During the first appointment on May 16, 1996, Dr. Joseph performed a physical exam. He found that her extremities were unremarkable. Her musculoskeletal exam revealed tenderness in her finger joints. She had multiple myofascial tender points in her neck, back, chest, arms, and legs. There were no other tests done and there was no lab work done.

On the second appointment on March 12, 1999, Dr. Joseph performed a physical exam and found only tenderness and swelling in plaintiff's finger joints. Although he diagnosed fibromyalgia, he made no note of the number of trigger

55

points, if any, used to determine whether a patient has fibromyalgia. There were no other tests done and there was no lab work done.

On the third visit, August 22, 2002, Dr. Joseph performed a physical exam and found no joint tenderness and no joint swelling. He noted that she was fairly stable and had nothing rheumatologic. There was no other exam done and no lab work was performed.

Clearly the opinions expressed by Dr. Joseph in the MSS-Physical and MSS-Mental completed on October 1, 2002, were not supported by any medical signs or laboratory findings.

During the fourth visit, on May 5, 2003, Dr. Joseph performed a physical exam and found 18 of 18 trigger points for fibromyalgia. No other findings from that exam were listed, and no lab work was done. Dr. Joseph prescribed only Neurontin, used to treat seizures, and Lexapro, used to treat depression. He prescribed no pain medication. Plaintiff did not allege depression or anxiety, and Dr. Joseph made no findings with regard to plaintiff's mental health. Yet four days later, he completed another MSS-Mental finding that plaintiff is extremely limited in every mental ability, no matter how small.

It is clear that this factor supports the ALJ's decision to give little or no weight to the MSS's completed by Dr. Joseph.

**Consistency of the Opinion with the Record as a Whole**

As mentioned repeatedly above, Dr. Joseph's opinions in the Medical Source Statements are not at all supported by his own treatment notes and are

not supported by the other medical evidence in the record. Dr. Joseph said on August 22, 2002, that plaintiff was "fairly stable". Dr. Coleman stated on September 25, 2002, that he saw no visual reason for a claim of disability. On October 1, 2002, Dr. Nye remarked that plaintiff's heart and lungs were normal and her hypertension was controlled. On November 11, 2002, Dr. Andrew said that he saw no evidence of any active neurologic process to account for plaintiff's symptoms. Her electrophysiologic evaluation was normal. On January 2, 2003, Dr. Langevin noted that plaintiff's electrocardiogram was normal. On April 18, 2003, Dr. D'Amour performed an exam and all findings were normal. On May 5, 2003, Dr. Joseph noted that plaintiff's diabetes was being controlled with diet and weight loss. On November 18, 2003, Dr. Subramanian observed that plaintiff's gait was normal, her range of motion was fine, she had no arthritis or arthropathies of the small joints of the hands.

Dr. Joseph's medical records are not contradicted by the other evidence in the record. However the Medical Source Statements he completed are not supported by anything in the record, not even his own treatment records. It appears to me that Dr. Joseph simply did not take these forms seriously. Regardless, there is no question that the opinions expressed in the Medical Source Statements by Dr. Joseph are not at all consistent with the record as a whole. This factor supports the ALJ's decision to give little or no weight to the MSS's of Dr. Joseph.

**Specialization of the Doctor**

No specialization is listed on any of Dr. Joseph's medical records; however, Disability Determinations addressed its request for medical records to "Michael Joseph, M.D., Midwest Allergy & Arthritic Ct". Dr. Joseph stated in one of his records that he did not think plaintiff had "anything rheumatologic" so he may also specialize in rheumatology. This particular factor does not appear to be all that important, except I do note that two of the three Medical Source Statements at issue here are for mental limitations, and there is no evidence that Dr. Joseph is a mental health expert.

In addition to the factors described above, I note that on April 18, 2003, plaintiff saw Dr. D'Amour for the first time and reported on the new-patient forms that she exercises occasionally. This is inconsistent with Dr. Joseph's findings on the MSS-Physical that plaintiff can do almost nothing physically.

On August 15, 2003, plaintiff told Dr. Kent she could handle her finances without difficulty, and she drives several times per week. These activities are inconsistent with Dr. Joseph's findings on the MSS-Mental that plaintiff is extremely limited in all of her mental abilities, including the abilities to understand, remember, and follow very simple instructions.

Based on all of the above, I find that the ALJ properly discounted the opinion of Dr. Joseph as expressed in the Medical Source Statement - Physical and the two Medical Source Statements - Mental.

## VIII. SEVERITY OF MENTAL IMPAIRMENT

Finally, plaintiff argues that the ALJ erred in finding that plaintiff's mental impairment is not severe. An impairment is "non-severe" if it has no more than a minimal impact on an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a) and 416.921(a); Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989). An impairment may be found "not severe" only if the impairment is so slight that it is unlikely the person would be found disabled even if her age, education, and experience were taken into account. Bowen v. Yuckert, 482 U.S. 137, 153 (1987). "Basic work activities" include mental capacities for understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b)(3)-(6) and 416.921(b)(3)-(6).

The ALJ's analysis with regard to plaintiff's mental impairment is repeated below:

> The claimant testified that she has depression and anxiety, associated with her physical problems. She said she has difficulty concentrating and memory loss. The claimant also said she has insomnia and often does not go to sleep until 3:00-4:00 a.m.
>
> At the request of the undersigned, Jan Snider Kent, Ph.D., performed a consultative psychological evaluation of the claimant in August 2003. The claimant reported she has no history of inpatient or outpatient psychiatric or psychological treatment. She has been prescribed medication for emotional difficulties; however, she said she could not continue to take the medication because of extreme side effects. The claimant told Dr. Kent that she gets up around 10:00 a.m., then feeds their dogs and waters her outside flowers. She does laundry and loads the dishwasher. She said she

59

handles her finances without difficulty. The claimant indicated that she has problems with anxiety and panic attacks at times. She denied agoraphobic symptoms. She stated she had a past history of bulimia when she was going through a divorce. Dr. Kent noted that the claimant did not appear to have difficulty with concentration and attention during their interview. She did not display significant pain behavior or unusual motor activity. The claimant's intellectual functioning was estimated to be in the average to above average range. Further cognitive testing revealed decreased memory skills. Her judgment skills were in the average range. The Minnesota Multiphasic Personality Inventory - Two (MMPI-2) revealed a valid profile consistent with an individual who is rigid, inflexible and self-centered, which may result in a low tolerance for stress. These individuals typically report many somatic complaints, depression and irritability. Dr. Kent diagnosed the claimant with panic disorder without agoraphobia, generalized anxiety disorder and history of bulimia nervosa, in partial remission. She opined that the claimant is able to: understand and remember moderately complex instructions during a normal workday; concentrate and persist on simple tasks; interact in a moderate contact situation involving the general public; interact in a moderate contact situation involving work supervisors and/or co-workers; adapt to a moderately demanding work environment and manage her funds independently.

Dr. Kent provided a Medical Source Statement - Mental, dated August 15, 2003, in which she opined the claimant has no significant limitations in her ability to perform work-related mental activities.

Dr. Kent diagnosed the claimant with panic disorder, without agoraphobia, generalized anxiety disorder and history of bulimia nervosa, in partial remission. However, these diagnoses seem to be based upon the claimant's statements only. There is no medical evidence support[ing] these diagnoses. Because the claimant has been prescribed medication for depression, she will be evaluated under Listing 12.04 and within the "B" criteria prescribed for the evaluation of mental impairments.

The first step of the "B" criteria, "activities of daily living", assesses adaptive activity such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using the telephone and directories, using [the] post office, etc. The undersigned has reviewed the documentary evidence of record and finds that the claimant drives as needed. She is able to handle her own finance[s] and care for herself appropriately. She cooks and shops for groceries with her husband. She stated she is able to

60

vacuum, load the dishwasher and do laundry. She visits with friends when they come to her home. Claimant's degree of limitation is "mild."

The second area of "B" criteria, "social functioning", assesses an individual's capacity to interact appropriately and communicate effectively with others. She gets out in public regularly, goes shopping and out to eat with her mother-in-law, visits with her parents and apparently has little difficulty interacting with others. Claimant's degree of limitation in this area is "mild."

The third "B" criteria, "concentration, persistence, or pace", assesses the ability to sustain focused attention sufficiently long to permit timely completion of tasks commonly found in work settings. She drives a vehicle and handles her own finances. She indicated she does not read much anymore, but attributed that to problems with her eyes, rather than lack of concentration. Although she alleges difficulty concentrating, there is no evidence of a concentration deficit. In fact, Dr. Kent specifically noted that the claimant did not have any difficulty concentrating during her evaluation. Claimant's degree of limitation in this area is "mild."

The last area of function evaluated under the "B" criteria is repeated episodes of decompensation, each of extended duration. This refers to repeated failure to adapt to stressful circumstances, which cause the individual to either withdraw from that situation or to experience an increase of signs and symptoms with accompanying difficulty in maintaining activities of concentration and task persistence. There is no evidence of such deterioration or decompensation.

(Tr. at 17-18).

There is very little evidence in the record to support a finding that plaintiff's mental impairment is anything but non-severe. On March 12, 1999, Dr. Joseph noted that plaintiff "may have some underlying depression associated with her [physical] symptoms." He prescribed Paxil and told plaintiff to come back in six months. She did not return for three years. On October 1, 2002, Dr. Nye diagnosed depression with anxiety, uncontrolled. However, the only support in his medical notes for such a diagnosis is plaintiff's reports of her medical

61

history – she reported that she suffers from depression and anxiety, that she has insomnia, that she has difficulty concentrating, she suffers from forgetfulness, loss of motivation, irritability, and depressed mood, and she feels anxious. She stated that she was on an antidepressant prescribed by Dr. Joseph but could not say what it was called. In fact, plaintiff had not been prescribed any depression medication by Dr. Joseph for over three years. During her last visit with Dr. Joseph, about five weeks before she saw Dr. Nye, Dr. Joseph prescribed no depression medication at all, and he made no diagnosis of depression or anxiety.

On November 20, 2002, plaintiff returned to see Dr. Nye who again diagnosed depression with anxiety, uncontrolled. Once again, this diagnosis is based entirely on plaintiff's report of her past medical history. Curiously, the notes also state that plaintiff disagreed with the diagnosis of "anxiety" and she refused to accept a prescription for that ailment.

There are no other references to any mental impairment in any of plaintiff's treating physician's records.

Dr. Kent performed a psychological evaluation of plaintiff on August 15, 2003, at the request of the ALJ. She noted that plaintiff had never received outpatient treatment for emotional difficulties other than medication. She was never hospitalized for psychiatric reasons. Her mood appeared normal and her affect full in range. Plaintiff had no problems with concentration or attention and her eye contact was appropriate. Dr. Kent found that plaintiff would be able to understand and remember moderately complex instructions. She could

concentrate and persist on simple tasks.  She could interact in a moderate contact situation involving the general public, work supervisors, and co-workers.  She could adapt to a moderately demanding work environment.  And she was capable of managing her funds independently.

Dr. Kent's findings were made after reviewing plaintiff's medical records, performing a mental status evaluation, performing six-item cognitive impairment test, and performing a psychodiagnostic interview.  No other doctor performed such extensive mental health tests.

Based on a thorough review of the record, I find that the only evidence in the file that indicates plaintiff has anything but a non-severe mental impairment consists of the Medical Source Statements - Mental completed by Dr. Joseph and already found to be completely unreliable.  No other doctor has found that plaintiff suffers from a severe mental impairment.

I find that the substantial evidence in the record supports the ALJ's finding that plaintiff's mental impairment is not severe.

## IX.  CONCLUSIONS

Based on all of the above, I find that the ALJ properly analyzed plaintiff's credibility and found her subjective allegations of disabling pain to be less than credible, the ALJ properly gave little or no weight to the Medical Source Statements prepared by Dr. Joseph, and the ALJ properly found that plaintiff's mental impairment is not severe.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.




_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
April 20, 2005

Case 3:04-cv-05063-REL   Document 19   Filed 04/20/05   Page 64 of 64